**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

|  |  |  |
|---|---|---|
| **PERCELL JEFFERSON JR.,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| v. | ) ) | CIVIL NO. 3:08CV486 |
| **HARCO NATIONAL INSURANCE CO., et al.,** | ) ) ) | |
| **Defendants.** | ) ) | |

**MEMORANDUM OPINION**

This matter is before the Court on Plaintiff Percell Jefferson, Jr.'s Motion for Partial Summary Judgment (Docket No. 31), and Defendant Harco National Insurance Co.'s Motion for Summary Judgment (Docket No. 29.) The matter has been fully briefed and argued, and is now before the Court for resolution. For the reasons set forth herein, the Plaintiff's Motion for Partial Summary Judgment will be GRANTED IN PART and DENIED IN PART, Defendant Harco's Motion for Summary Judgment will be GRANTED IN PART and DENIED IN PART, and Plaintiff's Renewed Motion to Compel will be DENIED AS MOOT.

**I. Facts**

The following are deemed to be the relevant, undisputed facts and reasonable inferences that are necessary and appropriate in resolving the pending issues.[1]

---

[1] The Court has also attempted to summarize the parties' respective positions with regard to the various issues involved, in light of the pertinent facts, without necessarily endorsing any position at this juncture.

(1) Plaintiff, Purcell Jefferson ("Jefferson"), was employed during the relevant time period by Professional Delivery Systems ("PDS"). (Compl. ¶ 1.)

(2) PDS leased the truck driven by Jefferson from International Truck Sales of Richmond, d/b/a/ Idealease of Richmond ("Idealease"). (Compl. ¶ 1.)

(3) Idealease insured the truck leased to PDS through Defendant Harco National Insurance Company ("Harco"). (Compl. ¶ 2.)

(4) PDS also insured the truck through their own insurance carrier, National Casualty Company ("National Casualty"). (Compl. ¶ 2.)

(5) Jefferson was injured in an automobile accident in Hanover County, Virginia on August 19, 2007 while driving a truck owned by his employer, PDS, and while in the course of his employment. (Compl. ¶ 1.)

(6) The liability insurer for the other vehicle that was involved in the accident has paid its full liability limits of $100,000 as partial compensation to Jefferson for the medical bills and injuries he incurred as a result of the accident. (Compl. ¶ 11.)

(7) Idealease's insurer, Defendant Harco, has denied Jefferson's claims by asserting that PDS's insurer National Casualty, is the primary insurer, and that Harco's coverage is not therefore implicated for the August 19, 2007 accident because Harco's coverage would only be applicable if Idealease did not have other available coverage. (Compl. ¶ 2.)

(8) Harco bases its argument on the policy provision ("Contingent Coverage") that provides that: "The insurance provided by this endorsement does not apply if, at the time of the accident, the insurance or indemnity required by the 'lease or rental agreement' is collectible." (Def.'s Ex. C.)

(9) National Casualty's policy for PDS provided $100,000 in underinsured/uninsured motorist ("UM") coverage, and National Casualty does not dispute that such coverage applies to Jefferson. (Compl. ¶ 12.)

(10) However, National Casualty also asserts that if both carriers are found to provide coverage to Jefferson, then there is a conflict as to the priority of coverage that requires judicial determination as to which coverage applies initially. (Compl. ¶¶ 20-21.)

## II. Analysis

Defendant Harco argues that pursuant to the contingent coverage provision in the

insurance contract it issued to Idealease, Jefferson was not a "covered" driver of the truck

leased by PDS so as to implicate Harco's uninsured/underinsured motorist ("UM") coverage for the subject incident. (Def.'s Memo at 6.) Specifically, Harco asserts that the UM coverage provided for in Idealease's policy was contingent on whether the lessee (PDS) had obtained alternate coverage. (Def.'s Memo at 6.) Where such coverage was obtained through National Casualty, Harco's coverage was never "triggered" according to the argument. (Def.'s Memo at 6.) Furthermore, Harco asserts that the UM contingency provision in the Idealease policy does not limit Jefferson's ability to recover "all sums" which would fully compensate him for his injuries under applicable statutory provisions, so there is no conflict between the statute and the policy. (Def.'s Memo at 11.) The UM statute, Va. Code § 38.2-2206(A), requires that "no policy…shall be issued or delivered by any insurer licensed in this Commonwealth…unless it contains an endorsement or provisions undertaking to pay the insured all sums that he is legally entitled to recover as damages from the owner or operator of an uninsured motor vehicle, within limits not less that the requirements of § 46.2-472." Alternatively, Harco argues that if coverage is provided by its policy, it is only "excess coverage" over and "behind" the primary coverage of National Casualty, based on the UM limits set forth in the Harco policy at $100,000, as permitted by Virginia law. (Def.'s Memo at 7-8, 9.)

At the same time, Jefferson asserts that Harco's UM contingent policy is void because the terms conflict with the UM statute. (Pl.'s Memo at 1.) Specifically, Jefferson asserts that the contingency policy in the Harco policy evades the statutory requirement under § 2206 to provide the insured "all sums he is legally entitled to recover", and there is no language in the statute allowing for contingency provisions. (Pl.'s Memo at 6-7.) Additionally, Jefferson contends that Harco's potential liability pursuant to the policy is,

3

in fact, $1,000,000 because Harco failed to furnish a valid rejection of higher UM limits as required by § 2206 when the limits were earlier reduced in 2001. (Pl.'s Memo at 10-11.) Furthermore, even if a valid waiver is established for 2001, Jefferson asserts that Harco failed to issue a new waiver form, as required, when it issued a "new" policy to Idealease in 2004, so that the original limits of $1,000,000 still apply. (Pl.'s Memo at 11-12.)

This Court must first determine whether Harco's UM contingency provision is valid under Virginia law. If the Court deems the proviso to be invalid, it will then determine whether the rejection by Idealease of the higher limits of UM coverage was valid, including whether the 2004 increase in UM limits by Idealease qualified as creating a "new" policy, or whether it constituted a "renewal" policy that did not require the strict notification requirement otherwise required. Finally, the obvious final issue concerns the distribution among the insurers must be determined in terms of which policy has priority as primary or secondary insurance.

**A.    The Validity of Contingent UM Provisions in Insurance Policies**

As previously noted, Harco's policy includes a Contingent Coverage provision that provides in relevant part that:

> A.  Liability Insurance and any required no-fault, uninsured motorist and underinsured motorist insurance provided by the policy for a covered "auto" which is a "leased auto" or "rented auto" applies subject to the following provisions:
>
> 1.  The insurance provided by this endorsement does not apply if, at the time of the accident, the insurance or indemnity required by the "lease or rental agreement" is collectible.

(Def.'s Ex. C.)

Harco asserts that the Plaintiff cannot recover under the Idealease policy because, pursuant to the contingency provision, he is ineligible for coverage. (Def.'s Memo at 6.) Specifically, Harco asserts that when PDS obtained collectible UM coverage with National Casualty, such "primary" coverage precluded the applicability of any other coverage possibly available to Jefferson by Harco for damages arising out of the subject incident. (Def.'s Memo at 6.) Harco therefore asserts that it fulfilled its only duty to insure that the policy would comply with Virginia law (Va. Code § 38.2-2206) by providing contingent coverage that required insurance for an uninsured or underinsured vehicle in the event the insured failed to obtain other collectible insurance. (Def.'s Memo at 6.) As a result, Harco argues that contingency provisions are not contrary to Virginia law, and that it fulfilled its obligations under applicable statutory provisions to provide sufficient coverage to Jefferson. (Def.'s Memo at 6-7.)

In response, Jefferson argues that Harco's contingent UM coverage provision is void pursuant to Virginia Code § 38.2-2206. (Pl.'s Memo at 1.) Va. Code § 38.2-2206(A) provides that:

> "…no policy or contract of bodily injury or property damage liability insurance relating to the ownership, maintenance, or use of a motor vehicle shall be issued or delivered in this Commonwealth to the owner of such vehicle or shall be issued or delivered by any insurer licensed in this Commonwealth upon any motor vehicle principally garaged or used in this Commonwealth unless it contains an endorsement or provisions undertaking to pay the insured all sums that he is legally entitled to recover as damages from the owner or operator of an uninsured motor vehicle, within limits not less than the requirements of § 46.2-472."

Section 2206 was intended to protect those injured by uninsured or underinsured motorists by requiring that they be adequately compensated for their injuries. Grossman v. Glen Falls Ins. Co., 211 Va. 195, 197 (1970); White v. Nat'l Union Fire Ins. Co. of

5

Pittsburgh, PA, 913 F.2d 165, 169 (4th Cir. 1990). Jefferson contends that by refusing to provide any coverage under the policy, Harco's UM contingency provision effectively denies the insured of "all sums he is legally entitled to recover as damages" under § 2206, and that such contingent coverage is otherwise contrary to the statute's purpose and intent, thereby rendering it void. (Pl.'s Memo at 6, 8-9.)

Contingency policies, in general, are not viewed as impermissible under Virginia law, and § 2206 is silent on the applicability of contingent provisions pertaining to UM coverage. See Va. Code § 38.2-2205; Providence Wash. Ins. Co, Inc. v. Gheen, 247 Va. 73 (1994). By applying the maxim, *expressio unius est exclusio alterius*, exceptions set forth in a statute are considered as the only exceptions the legislature intended to make available. GEICO v. Hall, 260 Va. 349, 355 (2000). Pursuant to § 2206, there is no exception for lessors like Idealease who provide contingent UM coverage. However, under the related statute, Va. Code § 38.2-2205, an explicit contingent exception for liability coverage is provided.

Significantly, the Virginia Supreme Court has found that there is a distinction between liability coverage and UM coverage. Seals v. Erie Ins. Exchange, 277 Va. 558, 563 (2009); GEICO v. Universal Underwriters Ins. Co., 232 Va. 326, 329 (1986). As such, the precedent of Providence Wash. Ins. Co., Inc. v. Gheen is inapplicable to this litigation because it concerned a contingent and excess liability insurance policy, not an UM policy. 247 Va. 73 (1994). Accordingly, in a § 2205 policy for UM coverage, the Seals Court held that even though there was a contingent exception under § 2205 excluding liability coverage by the insurer, the contingent exception did not also apply to UM coverage. Id. at 564. The failure to make an exception for UM coverage was

6

presumably not inadvertent. Id. The legislature was deliberate when creating the contingent liability exception under § 2205, and other sections of the predecessor statute. Id. As a result, the insured in Seals was entitled to UM coverage under § 2205, even though liability coverage was not available. Id.

Section § 2206 mandates UM coverage without exception. Therefore, any insurance provision that precludes all UM coverage violates § 2206. Bryant v. State Farm Mut. Auto. Ins. Co., 205 Va. 897, 901-02 (1965). In Bryant, the Court considered whether policies providing UM coverage were validly applied as "excess insurance" over any other insurance available. Id. at 898-99. By applying the requirement under § 2206 that an insured should be paid "all sums he is legally entitled to recover", the Court held that the insurance policy in question was void because it limited the plaintiff's recovery. Id. at 902. To find that the insured was not entitled to receive anything under the policy would, in effect, amend § 2206 by judicial fiat. Id. at 902. Accordingly, the Court held that the coverage applied, but only to the unpaid portion of any judgment, up to the applicable policy limits. Id. at 901-02.

Bryant is further supported by the Court's decision in State Farm Mut. Auto. Ins. Co. v. United Servs. Auto. Ass'n, 211 Va. 133 (1970). In State Farm, the Court found that the "excess" coverage clause did not conflict with the requirements of § 2206(A) because it provided a process for determining the distribution of liability among insurers, while providing the insured with all sums the insured was legally entitled to recover. Id. at 137-38. In upholding the enforceability of the policy, the Court made a distinction between the policy in State Farm and the policy in Bryant in that the State Farm policy did "not contain a limitation that would permit an insurance company to escape all or a

portion of its liability for UM coverage, thus depriving the insured of coverage to which he is legally entitled." Id. at 137. The Court further held that if there had been such a limitation, the policy would have been held void, even if it were labeled as an "excess" policy. Id.

UM statute § 2206 is to be applied liberally in order to accomplish its intended purpose of affording relief to injured persons, and any ambiguity should be construed in favor of the insured. Va. Farm Bureau Mut. Ins. Co. v. Williams, 2009 WL 1566983, *3 (Va. June 4, 2009); Seals v. Erie Ins. Exchange, 277 Va. at 560; Goodville Mut. Cas. Co. v. Borror, 211 Va. 967, 970 (1981), Nationwide Mut. Ins. Co. v. Clark, 213 Va. 666, 667 (1973). Given such a standard, it does not appear that contingency provisions can be applied to UM coverage when such a limitation would effectively allow insurers such as Harco to evade any and all liability under § 2206 so long as other coverage exists. The Virginia Supreme Court has held that when provisions in an insurance policy conflict with UM statutory provisions, the statute controls. Bryant, 205 Va. at 900. The lack of any statutory language permitting contingent coverage under § 2206, combined with language expressly permitting contingent liability coverage *only* under § 2205, demonstrates the intention of the legislature not to permit contingent UM provisions. In addition, the language of § 2206 requires that there be "no policy" that neglects to include a provision to "pay the insured all sums he is legally entitled to recover as damages" arising from an uninsured or underinsured vehicle. Unlike valid contingent liability provisions, a contingent UM provision that precludes UM coverage for the policy owner denies the uninhibited coverage that the statute requires. Harco's contingent UM provision is therefore void because liability and uninsured/underinsured coverage is

8

distinct under Virginia Supreme Court case law, and there is no statutory language expressly permitting a contingency provision for UM coverage that would not violate both the purpose and language of § 2206.

**B.     Amount of Coverage**

As Harco's contingency provision limiting UM coverage is invalid pursuant to the Virginia UM statute, the Court must next determine the amount of UM coverage available in the situation pursuant to the Harco policy. Section 2206 requires that an insured be entitled to limits equal to that of liability insurance under his policy, "unless any one named insured rejects the additional uninsured motorist insurance coverage by notifying the insurer as provided in subsection B of 38.2-2202." Pursuant to Virginia Code § 38.2-2202(B), any "new" insurance policy or original notice of insurance must contain a specified statement regarding UM coverage. Specifically, the notice must inform the insured that their UM insurance coverage will be the same amount as their liability coverage, unless the insured requests a reduction of coverage within twenty days of receiving their policy. Id. The statute does not require that the notice be in writing, but it provides that "[t]he insurer **may** require that such a request to reduce coverage be in writing", and "[a]fter twenty days, the insurer **shall** be relived of the obligation imposed by this subsection to attach or imprint the foregoing statement to any coverage continuance, or to any subsequently mailed premium notice." Id. (emphasis added)

As stated in the applicable contingency provision, Harco argues in the alternative that its coverage is only "excess", and should therefore be limited to $100,000 in UM coverage. (Def.'s Memo at 9-10.) A contingency provision like the one provided by the Harco policy is similar to an excess provision which provides coverage if there is no

9

other collectable insurance from an alternate insurer. The difference is that a contingency provision completely precludes any other coverage whatsoever, while an excess provision allows coverage, but only as a secondary insurer. Jefferson contends that Harco did not establish that there was a valid waiver rejecting higher UM limits equal to liability coverage because it failed to provide the notice required under §2202. (Pl.'s Memo at 10-11.)

Since Harco cannot avoid providing UM coverage to Jefferson, the only limitation is the amount of Harco's coverage, which necessarily involves the issue of the extent of "excess" coverage owed to Jefferson. Excess provisions are not void under Virginia law so long as there are no limitations on the amount the plaintiff is legally entitled to recover under §2206. State Farm, 211 Va. at 136-37. Unlike the contingency provision in the Harco policy, an excess policy is valid because it does not provide that there is no coverage at all, but that coverage is available after distribution is determined among the various insurance carriers involved, and primary coverage is exhausted. First, the amount from the primary insurer is applied towards the Plaintiff's damages. Then, in accordance with Bryant, "excess", or secondary coverage would only be applied to the unpaid portion of substantial damages up to the amount of the policy's UM limits. 205 Va. at 901-02. However, in order to determine the valid amount of "excess" coverage under the Harco policy, here, it first requires an analysis of whether there was a proper waiver of UM coverage under the 2001 form completed by Idealease, and whether the 2004 increase in UM coverage qualified as a "new" or "renewal" policy requiring a separate notice.

    1.    <u>Proper Waiver of UM coverage</u>

In order to determine the amount of UM coverage of the Harco policy, one must first examine whether there was a proper waiver of the UM coverage as required by §§ 2202(B) and 2206(A). Section 2202(B) requires that an insurance carrier provide a waiver form in order for the insured to reject the otherwise higher limits of UM coverage. Here, if Idealease did not submit a valid rejection of the higher UM coverage (equal to liability coverage) with the required waiver notice under § 2202, then the UM coverage in the Harco policy remains at $1,000,000. On the other hand, if PDS made a sufficient rejection in order to have UM coverage lower than the liability limits, then the Harco UM coverage would be reduced to $100,000.

There are two potential "rejections" of higher UM coverage at issue here. First, the appropriate statutory notice was given in a waiver form completed by the president of Idealease. (Def.'s Ex. D.) On the waiver form were two boxes to "check" – one that he could mark to indicate that he wanted the maximum statutory coverage equal to liability coverage; or a second box that he could indicate that he was rejecting equal UM/liability coverage and, instead, choosing a lower UM coverage amount. In the form he completed, dated March 21, 2001, the president of Idealease mistakenly checked *both* boxes, listed $70,000 as the minimum limit, and signed his name. The second rejection at issue occurred in November of 2004 when Idealease's president contacted Harco and orally stated that he wished to raise the UM coverage limits to $100,000, due to the rising costs of replacement parts on the company's vehicles. (Def.'s Ex. G.)

The relationship between Harco and Idealease commenced with the executed policy for 1998-1999, which did not include a contractual waiver form rejecting equal UM/liability coverage per § 2206(A). (Def.'s Exs. H - T.) However, the Harco policy did

include the notice form required under § 2202(B). (Def.'s Ex. M) Section 2206(A) only requires that the insured "reject[] the additional uninsured motorist insurance coverage by notifying the insurer" pursuant to § 2202(B); and § 2202(B) does not require that the rejection by the insured be in writing. Therefore, under either statute, the inclusion of the notice under § 2202(B) would be sufficient to inform Idealease of their right to reject equal UM/liability coverage. Thereafter, in May 2000, a letter was sent by Harco to Idealease requesting that Idealease complete the UM waiver form for the 1998-1999 policy, and Idealease returned the completed form. Although the form was not returned within the requisite twenty days of the mailing, untimely notification in the same year does not affect the validity of any rejection in subsequent years. GEICO v. Hall, 260 Va. 349 (Va. 2000); Jarrell-Henderson v. Liberty Mut. Fire Ins. Co., 2009 WL 347801, *3 (E.D. Va. Feb. 10, 2009); Ins. Co. of N. Am. v. MacMillan, 945 F.2d 729, 731-32 (4th Cir. 1991).

The intention of the parties as expressed in the insurance policy terms as compared to those terms required by statute is instructive in determining whether there was an effective rejection of the higher limits of UM coverage. Nationwide Mut. Ins. Co. v. Smelser, 264 Va. 109, 114 (2002); GEICO, 260 Va. at 356. As Plaintiff emphasizes, there is case authority to the effect that the parties' intent is irrelevant, and that an insurer must instead obtain an explicit rejection pursuant to §§ 2202 and 2206. White v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, 913 F. 3d 165, 169 (4th Cir. 1990). However, the White decision is distinguishable from the instant case in that the Court in White was analyzing a form where *no* box was "checked" for UM coverage alternatives, and it was a renewal policy that was in effect before the subject statute was amended to apply only to

new policies. Id. at 166. In addition, unlike the present situation which focuses on the ambiguity of the rejection noted in the waiver form, the issue in White only concerned whether the failure to select *any* option on the waiver form was a valid rejection of the higher limits of UM coverage. Id. at 169.

Several recent Virginia Supreme Court decisions have addressed the holding in White and their analysis has distinguished White from the present situation. In GEICO v. Hall, the failure by the insured to send the rejection of higher UM limits within twenty days was not determinative of whether there were subsequent actions by both the insured and the insurer that conclusively demonstrated a rejection of the higher limits of coverage. 260 Va. at 355. Rather, the mutual intent of the parties to reject the higher limits of UM coverage was demonstrated through the issuance of a renewal policy that stated the selection of lower UM coverage and a lower corresponding premium. Id. at 356. Similarly, in USAA Cas. Ins. Co. v. Alexander, the Court held that even though the insurance company forwarded the insured a waiver form, his failure to return the form was not sufficient to "negate [his] earlier decision to reject the higher limits of UM coverage." 248 Va. 185, 190 (1994).

Federal district courts analyzing Virginia law have also declined to strictly apply the Fourth Circuit's findings in White. For example, in analyzing both Hall and USAA, the Western District of Virginia upheld a valid waiver when a company accidently checked the wrong box to "[a]ccept UM limits equal to liability limits". Canal Ins. Co. v. Lebanon Ins. Agency, Inc., 543 F.Supp.2d 521, 522 (W.D. Va. 2008). In Canal, the Court found that there was a valid waiver of UM coverage, even though it was the insurance agent who changed the incorrect form with the selection of the higher liability limits, and

resubmitted it on the company's behalf. Id. Likewise, a court in this District recently held that there was a valid rejection of higher UM limits equal to liability limits even though the insured failed to check an additional box for the lower UM limits. Jarrell-Henderson, 2009 WL 347801, at *3. The plaintiff in Jarrell-Henderson failed to check the box that stated: "I wish to elect Uninsured/Underinsured Motorist Coverage at:", but did check the following box that stated "$70,000 Single Limits". Id. The Jarrell-Henderson court held that the notification of intent, both verbally and in writing, by the insured plaintiffs to reduce UM coverage, and the consistent change in coverage by the insurer the following year on the policy statement, was sufficient to establish a valid rejection of higher UM limits. Id. at 4.

The analysis of the Courts in post-White decisions are more applicable to the present situation.[2] Contrary to the holding in White, more recent case law demonstrates that there is flexibility in determining whether a waiver form has in fact expressed a rejection of coverage by examining the actions of the parties in order to determine their intent. Just as in USAA, this Court cannot summarily negate the selection by Idealease of the lower UM coverage limits for failure to strictly follow statutory dictates, especially given that the amount was noted as $70,000, and then subsequently increased to $100,000. Here, as in Canal and Jarrell-Henderson, where the insureds inadvertently "checked" the wrong box, Idealease apparently accidently checked both boxes on the UM coverage waiver form. Therefore, where the marking of both boxes is ambiguous, the Court must discern the intent of the parties in order to determine which selection prevails.

---

[2] Pursuant to Erie R. Co. v. Thompkins, this Court is bound to follow interpretations of the relevant provisions of the Virginia Code by the Virginia Supreme Court. 304 U.S. 64 (1938).

The intent of the parties is demonstrated by the written policy limit of $70,000 for UM coverage on the original policy, the request by Idealease's president to increase UM coverage limits from $70,000 to 100,000 in November 2004, and the written policy limit of $100,000 for UM coverage on all subsequent policy statements.[3] (Def.'s Ex. L; Def.'s Ex. G; Def.'s Ex. D.) Under § 2202(B), rejection of higher coverage is not required to be in writing. Thus, it is fair and reasonable to conclude that the 2004 discussion between the parties that increased UM coverage "controls" over the 2001 form, which mistakenly selected both coverage limits. Even though Harco's 2001 waiver form states that: "the selection applies to subsequent renewals of coverage, unless changed in writing by the name insured", where the selection in the 2001 form itself is ambiguous, it is not possible to discern which selection "applies" without reference to the intent of the parties. The continuous UM limits of $70,000 before the increase in 2004 to $100,000 establishes the intent of the parties to in fact, reject higher UM limits under the original 1998-1999 policy. Accordingly, pursuant to § 2202(B), the 2004 oral agreement controls as the relevant rejection of higher UM coverage.

When an insured reduces UM coverage, the waiver and reduction of that coverage remains in effect for subsequent policy renewals. Jarrell-Henderson, 2009 WL 347801 at *10; MacMillan, 945 F.2d at 732; USAA, 248 Va. at 190. Therefore, when Idealease contacted Harco about increasing their UM coverage from $70,000 to $100,000, that limit remained in effect through the subsequent 2006-2007 policy at issue here. Moreover, like the insureds in GEICO and USAA, Idealease continued to maintain the same lower limits of UM coverage for each year the policy was renewed. Then, when

---

[3] Harco also notes that the policy premium was determined based on the lower limits of UM coverage. (Def.'s Memo at 7.)

Idealease desired to modify the policy, the modification was accomplished by the conversation between Idealease's president and a Harco representative. The essence of the conversation is substantiated by the revised policy limits that increased to $100,000 for UM coverage thereafter. If the parties had desired that the coverage be equal to the liability limits of $1,000,000, there would have been no necessity to contact Harco in order to request an increase to $100,000. Therefore, based on the intent of the parties, the form returned by Idealease in 2001 satisfied its obligation to obtain a rejection of the higher limits of UM coverage for the original policy, and the subsequent increase in 2004 for $100,000 UM coverage also qualifies as a valid rejection of the higher UM limits.

    2.    <u>Whether the 2004 increase in UM coverage created a "new policy" or remained a "renewal policy"</u>

Whether there was a proper waiver to reject the higher limits of UM coverage, one must also determine whether the increase of the UM coverage amount in November 2004 created a "new" policy that required another waiver form pursuant to §§ 2206 and 2202; or if the increase was simply a "renewal" of the original policy. It is well established under Virginia case law and statutory law (§ 2202(B)) that UM statements that reject coverage equal to liability coverage do not have to be attached to so-called "renewal" policies. <u>Hall</u>, 260 Va. at 355; <u>USAA</u>, 248 Va. at 188-89. Under §§ 2206 and 2202, if Harco forwarded a "new" policy without providing a form for the insured to reject the option for the higher limits of UM coverage, equal limits for both liability and UM coverage would then apply as the default option. Jefferson argues that a new policy was created when the policy limits increased from $70,000 to $100,000 in 2004, because there was no explicit rejection of equal UM/liability coverage limits. (Pl.'s Memo at 11.) Thus, it is asserted, if the policy in effect at the time of Jefferson's accident (2006-2007)

16

was, in fact, a renewal policy of the original waiver provided in 2001, the issue of whether there was a waiver form in 2004 accompanying the increase in limits is rendered moot.

The only statutory reference germane to the issue of whether a policy is "new" or a "renewal" is the definition of "renewal" set forth in Virginia Code § 38.2-2212:

> "(i) the issuance and delivery by an insurer of a policy superseding at the end of the policy period a policy previously issued and delivered by the same insurer, providing types and limits of coverage at least equal to those contained in the policy being superseded, or
> (ii) the issuance and delivery of a certificate or notice extending the terms of a policy beyond its policy period or term with types and limits of coverage at least equal to those contained in the policy. Each renewal shall conform with the requirements of the manual rules and rating program currently filed by the insurer with the Commission."

Although the definition of "renewal" under § 2212 does not strictly apply to the UM statute, it does apply to liability and uninsured insurance coverage as addressed in the Virginia insurance code. Elliott v. Liberty Mut. Ins. Co., 983 F.2d 1055, 4 (4th Cir. 1993).[4] Elliot concerned an employee trying to claim the higher limits of his employer's UM automobile insurance policy, even though his employer had rejected carrying equal UM/liability coverage. Id. at 1. Just as Jefferson argues, the plaintiff in Elliot argued that the increase in coverage created a "new" policy, and the UM statute required the insurer to send another waiver form to reject the higher limits of UM coverage. Id. at 3. The Court held that because the increase in liability coverage and premium did not create a new policy, there was no requirement to provide an additional waiver form since an employer is only required to reject full UM coverage when there is a *new* policy. Id.

---

[4] As an unpublished opinion, Elliot is nevertheless entitled to weight because of the persuasiveness of it's reasoning. Hupman v. Cook, 640 F.2d 497, 501 n.7 (4th Cir. 1981).

Idealease's decision to increase UM coverage limits to $100,000 in 2004 constitutes a renewal of their policy, and not a "new" policy given the definition of "renewal" in § 2212 and the reasoning of the Elliot Court. Even though the manager in Elliot only increased liability limits, and not the UM coverage at issue, the Fourth Circuit still found that it was a renewal policy. Here, the fact that it was specifically the UM coverage that was increased to $100,000 is more indicative of a "renewal" policy which was at least equal to the previous policy terms under § 2212. The Legislature obviously amended § 2202 to only to apply to "new" policies so that the insurer would not be required to submit a new UM coverage waiver form each year when they renewed insurance policies. Policy limits increase over time in conjunction with increasing costs, and it would be an unreasonable burden for insurers and the insured alike to create "new" policies each time such coverage amounts increased. Finding in the instant situation that the Idealease policy was simply "renewed" when the UM coverage amounts were increased in 2004 insures compliance with § 2202, and is otherwise consistent with insurance policy practices and law.

## C. Priority of Coverage[5]

In determining the priority of UM coverage under more than one insurance policy, Va. Code § 38.2-2206(B) provides that: "[w]here there is more than one insurer providing coverage under one of the payment priorities set forth, their liability shall be proportioned as to their respective underinsured motorist coverages." Thus, if the UM coverage of multiple insurers is equally applicable to compensate the plaintiff, then the

---

[5] Although the Plaintiff has only requested partial summary judgment, the Court is constrained to address the priority of coverage because it was requested by Harco. The issue is one of a matter of law, and a logical derivative of the issues otherwise addressed herein.

insurance policy provisions shall govern. Therefore, Harco's policy endorsement and the "Contingent Coverage" provision regarding UM coverage determine the priority of coverage in relation to National Casualty. Under the Harco policy, UM coverage "is excess over any collectible insurance, whether primary, excess or continent, unless such insurance is specifically written to apply in excess of this policy." (Def.'s Ex. C.)

Harco's excess policy is valid because it provides coverage to Jefferson after distribution is determined among the various insurance carriers involved, and primary coverage is exhausted. Harco cannot avoid submitting UM coverage just because other UM coverage is available from National Casualty. To do so would deny Jefferson the full amount he is entitled to recover under § 2206. However, the total amount of coverage is that amount of UM coverage that is available under the policy, and not the highest UM limits equal to liability coverage. The ultimate question is not whether Jefferson is fully compensated by one insurer; but whether he is provided "all sums [he is] legally entitled to recover as damages" under § 2206 from all available UM coverage. Jefferson cannot recover $1,000,000 in UM coverage equal to his liability coverage for he is limited to the terms of the Harco policy of $100,000 in UM coverage.

By stating that UM coverage would be "excess" to any other collectible insurance, the Harco policy applies as secondary insurance to the primary insurance of National Casualty. First, both amounts from Harco and National Casualty are compiled to determine the total amount of coverage that is available to Jefferson, and to insure that it is to be applied towards his total damages resulting from the subject incident. Then, the amount from the primary insurer, National Casualty, is first applied towards Jefferson's damages. After that amount is applied, in accordance with <u>Bryant</u>, Harco's "excess", or

19

secondary coverage would only be applied to the unpaid portion of substantiated damages up to the amount of the policy's UM limits. 205 Va. at 901-02. Accordingly, once the $100,000 already pledged from National Casualty, and the $100,000 from Harco, are added together as total UM coverage for Jefferson, there is a total amount of $200,000 in available coverage for damages arising from the subject incident. Stated another way, National Casualty's $100,000 coverage limit should be first applied as primary insurance, and Harco's $100,000 coverage limit follows as secondary, or "excess" insurance. Therefore, while Harco's UM contingency provision is held to be invalid under Virginia law, the validity of the rejection of higher limits of UM coverage, as evidenced through party intent, and the validity of the "excess" provision in Harco's policy, results in Harco being considered as a secondary insurer and liable to Jefferson for the amount of up to $100,000 in UM coverage.

### III. Conclusion

For the reasons set forth above, Plaintiff Percell Jefferson, Jr.'s Motion for Partial Summary Judgment (Docket No. 31) will be GRANTED IN PART AND DENIED IN PART, Defendant Harco National Insurance Company's Motion for Summary Judgment (Docket No. 29.) will be GRANTED IN PART and DENIED IN PART and Plaintiff's Renewed Motion to Compel will be DENIED AS MOOT.

An appropriate ORDER shall issue.

_____/s/_____
Dennis W. Dohnal
United States Magistrate Judge

Dated: June 18, 2009
Richmond, Virginia